377 So.2d 132 (1979)
Ruth VILLETTO
v.
Dr. David A. WEILBAECHER et al.
No. 9538.
Court of Appeal of Louisiana, Fourth Circuit.
April 12, 1979.
As Amended October 15, 1979.
*133 Steven R. Plotkin and Joseph M. Singerman, New Orleans, for plaintiff-appellee.
Vance E. Ellefson, Lemle, Kelleher, Kohlmeyer & Matthews, New Orleans, for defendants-appellants.
Before REDMANN, BOUTALL and GARRISON, JJ.
GARRISON, Judge.
On October 12, 1973 plaintiff Ruth Villetto slipped and fractured her left patella. She was admitted to Baptist Hospital where an open reduction and internal fixation of the left patella was performed by defendant Dr. L. Terrell Tyler. A posterior plaster splint and bandages were placed on the leg. After the operation Mrs. Villetto began to complain of a burning sensation on the back of her left calf.
Defendant Dr. David Weilbaecher, Dr. Tyler's associate saw the plaintiff the day after surgery. He was told of the pain so he removed the splint and observed swelling and blisters on the back of the leg. He applied vaseline to them and rewrapped the leg. He did not know what caused the blisters, nor did he make a note of them in the chart, but he informed Dr. Tyler of them. Dr. Weilbaecher visited the plaintiff three more times, on October 20, 21, and 25.
Dr. Tyler saw Mrs. Villetto on October 19. He unwrapped her leg and observed the blisters. He did not know what caused the blisters and did not consider them serious enough to note in the records. He continued the treatment of Dr. Weilbaecher by applying a sterile dressing.
The first notation of the blisters appears in the nurse's notes of October 20. On October 26 Dr. Tyler mentioned them in his progress notes and treated them with Zephiran, a mild antiseptic solution. Mrs. Villetto was discharged on October 30. She was still complaining of pain.
Dr. Tyler continued to treat the plaintiff after her discharge. He saw her twelve times at his office. On the second visit November 12, he changed her treatment to Elase ointment to dissolve scars that were beginning to form. He continued this treatment and began debrading the area. Percodan was given for pain. This treatment was continued for five visits until December 27 when all of the open areas had closed. Dr. Tyler advised the plaintiff to use baby oil to make the skin pliable. This treatment was continued for the remaining visits.
At the trial three doctors testified, in addition to the two defendants. Dr. Licardi, an expert orthopedic surgeon testified that the condition could have been a viral inflammation from herpes zoster or it could have been a hypersensitivity to a prepping agent. He said he would probably not consult a specialist upon discovery of such a condition. He stated that he would object to the use of cortisone because it slows down the healing process. He testified also that he would object to removing immobilization plaster so as to treat the blisters on a daily basis. Generally, he would have treated the condition in the same manner as did the defendants. However, Dr. Licardi indicated that if he did not know the cause of the patient's condition and he considered it serious, he would have called in a consultant. However, in this case he did not consider the discoloration and scars medically serious.
*134 Dr. George Farber, a dermatologist testified for the plaintiff. He diagnosed Mrs. Villetto's blister as a herpes zoster viral infection, that is, "shingles." The condition usually appears on the upper trunk and when it does not it is often misdiagnosed. If treatment is begun within 24-36 hours there will be less scarring, swelling and pain. The treatment would be applications of a drying agent such as a topical steroid salve if it would not interfere with the bond healing. If the cast could not be removed a window could be made in it and the shingles treated with silver nitrate or ultraviolet light.
The third doctor to testify was Dr. Louis Krust. Both he and Dr. Farber opined that the plaintiff would not benefit from plastic surgery to remove the scars.
The trial court found no negligence on the part of the hospital or its agents. It then posed the question of whether the doctors were "guilty of such acts which caused them to have violated that standard of care in the community which the jurisprudence characterizes as being malpractice if so violated."
The judge found that Dr. Weilbaecher did not have sufficient contact with the patient to have been negligent; and on the occasions he saw her he followed the necessary standard of care.
The court was not impressed with Dr. Farber, however it accepted his testimony as to the cause of the blisters. Therefore, it found Dr. Tyler negligent in not calling in a consultant or informing his patient that he did not know the origin of her condition; she should have been referred to a specialist.
The court based its ruling on Favalora v. Aetna Casualty & Surety Co., 144 So.2d 544, 550 (La.App. 1st Cir. 1962):
"We believe that conformity with the standard of care observed by other medical authorities in good standing in the same community cannot be availed of as a defense in a malpractice action when the criterion relied upon is shown to constitute negligence in that it fails to guard against the injury to the patient from reasonably foreseeable contingency...."
It may be argued that the court was inconsistent in finding Dr. Weilbaecher free from negligence in that he also did not call in a specialist when he saw the blisters and did not know their cause. However, the court appears to have felt he relieved himself of any duty by informing Dr. Tyler of the situation and letting him prescribe the treatment.
The applicable law in this case is La.R.S. 9:2794[1] which the Supreme Court determined was to be applied retroactively since it is characterized as procedural. Ardoin v. Hartford Acc. & Indem. Co., 360 So.2d 1331 (La.1978).
There is support in the jurisprudence for a finding of negligence when a patient is not referred to a specialist. The critical question is whether or not the patient's failure to receive the proper standard of care contributed to her injury. Fairchild v. Brian, 354 So.2d 675 (La.App. 1st Cir. 1978) where defendant optometrist was negligent in not referring the patient to a qualified ophthalmologist who could have made a diagnosis. *135 However, it is not necessary to consult a specialist where the problem is within the sphere of the doctor's own training and expertise. Also it must be shown that consultation with a specialist would have resulted in different or additional treatment, or that such treatment would have been more beneficial than what was done. Parker v. St. Paul Fire and Marine Ins. Co., 335 So.2d 725 (La.App. 2d Cir. 1976) w.r. La., 338 So.2d 700. If one accepts Dr. Farber's testimony, the plaintiff in this case met this burden.
There have been cases in which incorrect diagnoses have been held to constitute negligence; Green v. State, Southwest La. Charity Hospital, 309 So.2d 706 (La.App. 3rd Cir. 1975) w.d. La., 313 So.2d 601, in which a doctor did not diagnose gas gangrene even though it was evident from the X-rays; Fox v. Argonaut Southwest Insurance Co., 288 So.2d 102 (La.App. 4th Cir. 1974), in which a physician was negligent in misinterpreting a cardiogram and in not obtaining a second opinion.
Accordingly, we concur with the finding of the trial court as to the issue of liability. There remains the question of damages.
The lower court awarded plaintiff $7,000.00 for the scar on her leg and $3,000.00 for pain and suffering. Ordinarily, if the trial court's award is not manifestly insufficient or excessive it should not be disturbed. Coco v. Winston Industries, 341 So.2d 332 (La.1976). However, in this case this court examined not only photographs of the scars but was given the opportunity to view the scars on the patient herself.
As the result of our view of the scars, it is our conclusion that the award of the court was manifestly insufficient. It should be emphasized that these are not ordinary scars but are large, mottled with various discolorations and most distinctive.
The petition alleged that Mrs. Villetto had been left "permanently disfigured by the unsightly scars." (emphasis supplied). This allegation is supported by the evidence.
The petition also alleges that "she has suffered greatly in body and mind, has suffered and will suffer a permanent scarring of the leg, from which she has suffered and will suffer great embarrassment and humiliation..." This allegation, from a viewing of the scars, seems justified.
The plaintiff, a woman in her late fifties at the time of acquiring the scars, in terms of probability can look forward to living with them for many more years. As a woman, unless she chooses to wear trousers the rest of her life, the scars will be much more constantly on display. Furthermore, as a woman the plaintiff's "embarrassment and humiliation", to quote the petition, will be greater than would be that of the average male.
The petition seeks (in addition to medical expense and hospitalization) $50,000.00 for "physical pain and suffering (past, present and future)" and $50,000.00 for "mental pain and anguish (past, present and future)." Despite the fact that the judgment below was inadequate, these sums would appear to be considerably more, on the other hand, than is called for by the evidence.
The trial judge, in his reasons for judgment, did not advert to his reasons for his finding of damages. He stated simply that he found for the plaintiff and against Dr. Tyler, with interest and cost from date of judicial demand," in the following amount:

1. Scar on leg: $7,000.00
2. Pain and suffering, past,
 present and future: 3,000.00

We believe that the adjustment to an adequate judgment, more in keeping with the damage suffered by the plaintiff, can be couched within the framework of the trial judge's phraseology. Therefore, we believe that the trial judge's finding should have been:

1. Scar on leg: $7,000.00
2. Pain and suffering, past,
 present and future: 8,000.00

The lower court did not award any special damages. However, the record reflects that most of the plaintiff's visits to *136 Dr. Tyler had to do with the treatment of her knee and not her leg. The last visit that concerned her leg was on December 27. However, there is no evidence in the record to support an award of special damages. The plaintiff introduced no doctor's bills etc. She testified that Dr. Tyler's bill was between $500 and $600 but she was not positive about the amount. Where the plaintiff's testimony that he paid a medical bill is supported by that bill, it is sufficient to support the inclusion of this item in the judgment. The test is whether or not those items have been shown to be more probable than not, Boudreaux v. American Ins. Co., 262 La. 721, 721, 264 So.2d 621 (1972). However, when a plaintiff testifies he spent an amount on medical expenses but does not explain what it was for it must be held unproven, State Farm Mutual Insurance Co. v. Terrebonne, 356 So.2d 1073 (La.App. 4th Cir. 1978). In this case the plaintiff's uncorroborated vague testimony would not be enough to meet her burden of proof.
"While the absence of independent, corroborating evidence may not be fatal to the plaintiff's burden of proof, the lack of even a minimal degree of detail or specificity in his own testimony as to the extent of the loss precludes an award, even under the holding in Jordan v. Travelers Insurance Co., 257 La. 995, 245 So.2d 151 (1971), relative to the degree of certainty required to support an award of monetary damages." Casadaban v. Bel Chemical & Supply Co., Inc., 322 So.2d 854, 859 (La.App. 1st Cir. 1975).
The trial judge did not err in failing to award damages for future plastic surgery in light of the plastic surgeon's testimony that the plaintiff would not benefit from an operation.
Accordingly, in all respects other than the trial court's award of damages, we agree with the trial court's judgment. With regard to the quantum, the judgment in favor of the plaintiff is amended so as to provide, in addition to the $7,000.00 for the scar on the leg, $8,000.00 for suffering, past, present and future. As amended, the judgment is affirmed.
AMENDED AND AFFIRMED
REDMANN, J., dissents and assigns reasons.
REDMANN, Judge, dissenting.
This is a case of coincidence both giving and taking away a chance of minimizing unsightly scarring from shingles on plaintiff's leg.
Coincidence might have saved 55-year-old Mrs. Ruth Villetto because she happened to be in the hospital at the onset of her shingles on the back of her knee. Had she been elsewhere, she would probably not have seen any doctor within the 12 to 36 hours during which scarring can be minimized in 90% of cases.
But coincidence also foiled the obtaining of the necessary medical attention because other knee problems had put her in the hospital and interfered with timely identification and treatment of shingles. She first experienced its burning onset upon waking up in the recovery room after surgery to wire together her broken kneecap and, understandably, her complaint was attributed to the surgery. Moreover, had shingles been then recognized, the dermatologist's preferred treatment of injected cortisone could not have been used because it is contraindicated when bone fractures are healing. Finally, the dermatologist testified that "it appears probable that the continued presence of a shield or cover oninto these blister areas may have aggravated or caused some aspect of the scarring." Thus, because immobilization of the knee required a wrapped splint or something similar, some scarring or aggravation of scarring would have been unavoidable.
The trial judge reasoned that the surgeon, Dr. Tyler, "should have, if not at the time of the first complaint, that is, within a few days postoperative, he should have, after the lady was discharged from the hospital, referred her to" a dermatologist.
Yet the most favorable testimony of the only dermatologist, Dr. Farber, is that "if treatment was initiated in the first 36 hours *137 of the initial symptoms, which were the itching and burning, then I think the patient would have to have had less scarring." Thus, because the burning appeared within three or four hours of the operation, the trial judge's reasoning is not supported by the record: referring plaintiff to a dermatologist a few days after the operation would have been too late even for the preferred treatment of injected cortisone to reduce scarring. As to pain, the record nowhere contains evidence that cortisone salve would reduce the pain and, because shingles is an ailment of a nerve which extends over a large distribution area (here affecting from heel to buttocks), beginning with a viral colony at the nerve root at the spine, a court is unable to indulge in a presumption that an external salve would relieve the pain from the impaired nerve. Accordingly the record does not support a conclusion that Mrs. Villetto's pain would have been avoided or reduced.
Nor would the record support a conclusion that the surgeon breached the standard of care of reasonable surgeons by failing to suggest consultation within 36 hours. Under the circumstances of the leg's having just been operated on and being in a splint, the surgeons did not act unreasonably in attributing Mrs. Villetto's discomfort preliminarily to the surgery and splinting.
Although the surgeons may have been at fault in not recommending consultation with a dermatologist as soon as they realized that they did not know the cause of the blistering, the record does not contain evidence that they should have had that realization and recommended and obtained the consultation, all within 36 hours of the onset of itching and burning, under the circumstances.
Taking all of the evidence in the most favorable light for plaintiffs, it does not establish as more probable than not that a breach of duty by defendants contributed to plaintiff's pain and scarring.

ORDER
The court itself moving that it decide whether its judgment of April 6, 1979 was improvidently handed down because of La. Const. art. 5 § 8(B)'s requirement of previous submission to a panel of five judges "when a judgment of a district court is to be modified or reversed and one judge dissents,"
IT IS ORDERED that Counsel be notified and may, if they wish, file briefs on that issue by April 19, 1979.

ORDER
It having come to our attention that our judgment of April 6, 1979 may have violated the constitutional requirement of a five-judge panel, we issued an order requesting briefs from counsel on whether the case should go to a five-judge panel. This order had the effect of suspending the judgment during our deliberations. We have now considered the matter, and we conclude the judgment should be reinstated.
La.Const. art. 5 § 8(B) requires submission of a case to a panel of five judges "when a judgment of a district court is to be modified or reversed and one judge dissents." In this case, two judges voted to affirm the trial court's judgment, but to amend it by increasing the amount of damages awarded. One judge voted to reverse completely, on the ground that the defendants were not liable. None of us agree completely with the trial judge, but there is disagreement; we disagree on the extent and the ground for modification and reversal. A five-judge panel is necessary when two judges would change the trial judge's opinion and one judge would affirm. However, where two judges say the trial judge is wrong for issue A, and the other judge says the trial judge is wrong for issue B, then no one judge agrees with the trial judge. Therefore, there is no need for a five-judge panel. See State Department of Highways v. Mims, 336 So.2d 24 (La.App. 3rd Cir. 1976) writ denied, La., 339 So.2d 16; Records of the Louisiana Constitutional Convention of 1973: Journal of Proceedings, Vol. 6, pp. 756-757.
Accordingly, it is now ordered that the judgment of April 6, 1979 be reinstated as *138 the judgment of this court. The delays for rehearing and/or writ applications shall begin from this date.
REDMANN, Judge, dissenting.
[W]hen a judgment of a district court is to be modified or reversed and one judge dissents, the case shall be reargued before a panel of at least five judges prior to rendition of judgment .... La. Const. art. 5 § 8(B).
When two judges would increase an award and the third would eliminate the award entirely, the third judge dissents from the increase, even more than he dissents from the affirmation. If one believes it unjust that a defendant be made to pay $10,000, then one necessarily believes it all the more unjust that he be made to pay $15,000.[1]
If, on the contrary, two judges would reduce an award and the third would reverse it entirely ("reduce" it to zero) the third judge does not dissent from the reduction but from the partial affirmation. He agrees with the reduction (as far as it goes), but for other reasons than those of the majority, and thus the court is unanimous in the reduction. And, to the extent that the court is not unanimous, to the extent that those two judges differ from the third, they are not "modif[ying] or revers[ing]" but affirming the trial judge and therefore the constitutional provision does not require submission to a panel of five.
Thus a dissent on liability necessarily constitutes a dissent, within Const. art. 5 § 8(B), from an increase in quantum, although not from a decrease in quantum.
It may also be argued that a dissenter on liability removes himself from the Court for quantum purposes and therefore has no business to consider and thus does not dissent from an increase in quantum. But there are two defects in that argument.
First, no Court of Appeal in Louisiana can be constituted by a panel of two judges; Const. art. 5 § 8(A) requires "panels of at least three judges" and therefore two judges cannot exclude the vote of the third judge and act as a panel of only two, thereby precluding dissent.
Second, a court or a judge does not decide isolated issues in a case but decides the case: the court's judgment is constituted only by its judgment and not by its reasons for judgment. If, for example, each judge would increase by $5,000 although for different reasonsone because scarring was inadequately compensated, another because pain was inadequately compensated, and the third to award punitive damagesthe judgment would be an increase of $5,000 notwithstanding that each judge expressly disagrees with the other two on the reason why an increase should be granted. Each would sign the decree, agreeing with the other two's judgment while disagreeing with their reasons. Here, I need not disagree with the other two judges' reasons: irrespective of their reasons and of my reasons, I disagree with their judgment.
I dissent from the modification of the district court's judgment, and that is all that matters. That I dissent even more than one who would affirm is immaterial. La.Const. art. 5 § 8(B) requires that this matter be submitted to a panel of at least five judges.
NOTES
[1] LSA-R.S. 9:2794 reads as follows:

"A. In a malpractice action based on the negligence of a physician licensed under R.S. 37:1261 et seq., or a dentist licensed under R.S. 37:751 et seq., the plaintiff shall have the burden of proving:
"(1) The degree of knowledge or skill possessed or the degree of care ordinarily exercised by physicians or dentists practicing in the same community or locality to that in which the defendant practices; and where the defendant practices in a particular specialty and where the alleged acts of medical negligence raise issues peculiar to the particular medical specialty involved, then the plaintiff has the burden of proving the degree of care ordinarily practiced by physicians or dentists within the involved medical specialty.
"(2) That the defendant either lacked this degree of knowledge or skill or failed to use reasonable care and diligence, along with his best judgment in the application of that skill, and
"(3) That as a proximate result of this lack of knowledge or skill or the failure to exercise this degree of care the plaintiff suffered injuries that would not otherwise have been incurred.
[1] Two judges concededly may not increase a $10,000 award to $15,000 if the third would affirm. It is incongruous to allow an increase by two judges when the third would reverse altogether. That would suggest to the third judge that, because a five judge panel offers the best hope of obtaining justice-as-he-sees-it, he should vote to affirm (or simply not to increase) rather than to reverse.